[Decided July 14, 1888.]

## TACOMA MILL COMPANY *v.* THE SHIP BLUE JACKET, AND F. F. PERCIVAL AND D. O. MILLS *v.* THE STEAM-TUG TACOMA.

ADMIRALTY — COLLISION BETWEEN SAILING VESSEL AND TUG — NEGLIGENT STEERING.—A ship following a swinging path, deviating about half a point alternately to starboard and port of its main course, approached about two o'clock in the morning a steam-tug, with a bark in tow, with the red lights visible. The tug, when about one-third of a mile distant, the ship bearing about one and three-eighths points off the port bow of the tug, and showing both lights to the bark and the red one to the tug, for the purpose of avoiding the ship, put her helm hard-a-port, when the ship, instead of keeping her course or putting her helm to port — either of which would have avoided the collision—negligently put her helm hard-a-starboard, and kept it in that position until the collision occurred. The mate of the tug had no license, and the tug kept no lookout, as required by law, but neither of these facts contributed to the collision, which was caused solely by the negligence of the ship's crew: *Held,* that the ship was liable for damages caused by the collision.

APPEAL in Admiralty from the District Court holding terms at Seattle. Third District.

A libel in admiralty was filed to recover the sum of $12,000 damages resulting from a collision between the ship Blue Jacket, of which the claimant, F. F. Percival, was master, and the tug Tacoma, owned by the libellant, the Tacoma Mill Company, which occurred about two o'clock A.M. on the 11th day of June, 1885, in the vicinity of Port Angeles, in the Straits of Fuca. The tug was towing the bark Colusa, laden with lumber, about 1,200 tons burden, to sea, and the Blue Jacket was coming in, under full sail, with a fair wind, in ballast.

The weather was cloudy, but clear, and a fresh breeze blowing from the west-southwest, and the ship was running before it with yards square and a fair tide, making about eight knots an hour. It was claimed by the libellants that the ship, when first sighted by the tug, was between one and two miles distant, about two points on the port bow, showing her red light. The tide, which was fair for the ship, was strong against the tug, and she was making about two

miles an hour by the land; and supposing that the ship was pursuing her course up the straits, she continued steering west-southwest, by her compass, being her proper course down. A few minutes later the red light disappeared and the green light appeared, and immediately thereafter both lights of the ship appeared, and it then became apparent that the ship was steering directly for the tug, and on a course nearly at right angles to that which she was apparently steering when first sighted. The mate of the tug, who was then in charge, it being the master's watch below, put his helm hard-a-port, rung the bell for the master to come on deck, hailed the ship, and sung out to him to port his helm; and as the master of the tug came on deck, under his orders, stopped and reversed the tug. The ship, however, still swinging with her helm hard-a-starboard, struck the tug nearly midship, at about right angles, greatly damaging and nearly sinking her. At the time the ship struck she had luffed up so that some of her sails were aback and some shaking in the wind, showing that her course, when she struck the tug, was nearly at right angles to her apparent course when first sighted. Part of the crew of the Tacoma, thinking she was about to sink, climbed, by means of the bob-stays and head-gear of the ship, on board of her, and the balance, remaining by the tug, managed to work her into Port Angeles, and afterwards to Seattle. The bill for necessary repairs and labor amounted to $7,878.56. She was detained fifty days, which the undisputed proof showed was reasonably worth $50 a day, making the total amount to be $10,378.56, together with interest on the repairs from the date of the collision. It was claimed by the libellant that the Blue Jacket was in fault: 1, in changing her course where no special circumstances existed rendering it necessary; 2, in starboarding her helm; 3, in having her side-lights placed on the mizzen-topmast backstays, and thereby in such a position as not throw a uniform or unbroken light from right ahead to two points abaft the beam, within the meaning of the statute in regard to sidelights; 4, in not showing a lighted torch upon the point or

quarter of the ship which the tug was approaching; 5, in
not hauling the spanker-boom amidships and bracing her
after-yards in on the starboard side, after the helm had
been put hard-a-starboard, so as to swing the vessel clear;
6, in not having a proper lookout.   On the other hand, the
claimant and the cross-libellant, who was the owner of the
ship, alleged that he had a proper lookout and proper side-
lights; that the collision was the fault of the tug; that the
tug was first sighted by the lookout of the ship, about four
or five miles distant and about half a point on her starboard
bow; that she kept that course until about one thousand or
fifteen hundred feet from the ship, when her helm was
thrown hard-a-port and she was thrown across the bows
of the ship; that this change of course on the part of
the tug was not known by those on board of the ship
until she was within about two hundred and seventy-five or
three hundred feet from the ship, and was steering directly
across her bows, and that the captain, fearing that if the
ship kept her course, she would collide either with the tug
or her tow, and supposing that the tug would stop and
reverse, and that he could thus clear her, put his helm
hard-a-starboard.   He charged that the tug was in fault:
1, in porting her helm; 2, in not indicating, by her whistles,
that her helm had been or was about to be ported; 3, in not
stopping and reversing sooner; 4, in having no side-lights;
.5, in having no lookout; 6, in not having a licensed mate on
board; 7, in allowing an officer on the tug to steer.   He
further claimed that, in consequence of the collision, the
ship was damaged to the extent of $900, and asked a decree
for that amount.   The two causes were consolidated, and
trial resulted in findings by the court in favor of the libellant
and the respondent in the cross-libel and a decree accord-
ingly; from which the claimant and cross-libellant appealed.

*Messrs. McNaught, Hanford & McGraw,* for the Claimant
and Cross-libellant.

*Messrs. Struve, Haines & McMicken,* for the Libellant and
Respondent in the Cross-libel.

Mr. Justice LANGFORD delivered the opinion of the court.

In this case the appeal is from both the findings of fact and the conclusions of law thereon. There is no contention but that the conclusions of law of the District Court were correct, if the findings of fact were correct, but the sole contention is that the District Court erred as to its findings of fact, and hence that conclusions of law predicated on such erroneous findings of fact were wrong, but only because the findings of fact were wrong. As this court refinds the facts as the District Court found them (with the additional findings requested by the proctor for the appellants hereunto attached and adopted by this court), all contention ceases, except as to the error of fact. The only opinion, therefore, that could be written in this case that would be germane to the question raised would be an opinion which would give reasons as to why the findings of fact are correct deductions from the evidence. Such could not be useful or necessary, and hence no attempt will be made to give reasons for the findings of fact. But these findings of fact and conclusions of law thereon are all the decision which the case requires, and they are as follows:

Findings of the Supreme Court:

"This cause having been heard upon the pleadings and proofs herein upon appeal from the District Court of the third judicial district of Washington Territory, holding terms at Seattle, to the Supreme Court of said Territory, and due deliberation being had, the Supreme Court aforesaid, being duly advised in the premises, finds:

"1. That the libellant, the Tacoma Mill Company, is, and at all times mentioned in the pleadings in this cause was, a corporation organized and existing under the laws of the State of California, and duly authorized to do business in the Territory of Washington.

"2. That said libellant before, and at the time of the collision mentioned in these findings was, and still is the owner and proprietor of the steam-tug Tacoma, with her steam-engines, boilers, machinery, tackle, apparel, and furniture;.

which said steam-tug said libellant used in towing vessels from, to, and between the various ports of Puget Sound and the Pacific Ocean, on the waters of Puget Sound and the Straits of Fuca, and through the waters tributary and adjacent thereto, and where she was regularly run daily and every day, except Sunday, for the purposes aforesaid.

"3. That on the eleventh day of June, 1885, at the hour of two o'clock in the morning of said day, said steam-tug Tacoma, with her steam-engines, boilers, apparel, tackle, and furniture on board, was towing the bark Colusa, of the port of Boston, of about twelve hundred tons burden, then and there lumber-laden, and bound upon a voyage to San Francisco, California, from the port of Port Townsend, in said Territory of Washington, to Cape Flattery; and the said steam-tug, with said tow, was then about four miles to the north of Ediz Hook light, in the Straits of Fuca, steering west-southwest one-half west, and moving along a path west one-half south at the rate of about two miles per hour by the land.

"4. That at that time, and up to the time when said ship put her helm hard a-starboard, as hereinafter mentioned, said bark was being towed by said tug by means of a hawser about one hundred and fifty fathoms in length, and from the stem of the said tug to the stem of said bark the distance was about seven hundred and fifty feet, and during all of the times mentioned herein said bark was steering the same course as said tug.

"5. That at that time, and during all times up to the collision hereinafter mentioned, the weather was cloudy, the air was clear, and a fresh breeze was blowing from the west-southwest, and the tide was flooding, running up the Straits of Fuca at the rate of three miles per hour from west-southwest, or west-southwest one-half west.

"6. That said steam-tug, at that time, and up to the time of the collision hereinafter mentioned, was tight, stanch, strong, and in every respect well tackled, appareled, and appointed, and had the usual complement of officers and men, and was also, except as hereinafter found, well manned.

" 7. That said tug, at that time, and at all times herein mentioned, carried all the lights prescribed by law, and carried the same in the manner prescribed by law, and the same were at all of said times properly set and brightly burning.

" 8. That said bark Colusa, at all times, carried all the lights prescribed by law, and the same were at all times properly set and brightly burning.

" 9. That at about ten minutes before two o'clock in the morning of said day, while said steam-tug was towing said bark Colusa, at the place and in the manner hereinbefore stated, and steering on the said course, the ship Blue Jacket, of San Francisco, whereof F. F. Percival was then and there master, and being then on her way from said San Francisco to the port of Seattle, in the Territory of Washington, was first sighted by the lookout of said tug, said ship then being about two miles distant from said steam-tug and showing her red light about three-tenths of a point on the port bow of said steam-tug.

10. That the mean course of said ship, at all the times mentioned in these findings up to the time her helm was put hard-a-starboard, was east-northeast, but her course was really along a swinging path, deviating alternately to starboard and port, about one-half a point each way from said mean course, and crossing the same about every half mile, at intervals of about every four minutes, up to the time her helm was put hard-a-starboard as hereinafter stated, which was done when said ship was on the port side of said mean course.

" 11. That said ship was running with a fair wind and tide, and at all times up to the time of the collision was going ahead at the rate of about eight miles per hour by the land.

" 12. That said steam-tug was first sighted by the lookout of said ship about half an hour before said collision, and was then about one-half a point off the starboard bow of said ship and five miles away from her, showing two white masthead lights to said ship at that time and at all times up to the time of said collision, the said tug steering at that

time and at all times until her helm was put hard-a-port, as hereinafter stated, a course of west-southwest one-half west, but, owing to the deflecting influence of wind and tide, moving along a path in the direction of west one-half south; that said tug, when so sighted by said lookout, was at once reported to the master and mate of said ship.

" 13. That, owing to the improper manner in which said ship was steered, and to the irregular course which she pursued in consequence of such improper management, said tug bore from said ship from time to time about as follows: At twenty-three and three-quarters minutes before said collision (being three and five-sixths miles away), dead ahead; at twenty-two and one-half minutes before said collision (being three and five-eighths miles away), dead ahead; at twenty-one and one-quarter minutes before said collision (being three and three-sevenths miles away), one-half a point off the starboard bow; at twenty minutes before said collision (being three and two-ninths miles away), one-half a point off the starboard bow; at eighteen and three-quarters minutes before said collision (being three miles away), one-half a point off the starboard bow; at seventeen and one-half minutes before said collision (being two and three-quarters miles away), one-third of a point off the starboard bow; at sixteen and one-quarter minutes before said collision (being two and five-eighths miles away), one-eighth of a point off the starboard bow; at fifteen minutes before said collision (being two and two-fifths miles away), one-twelfth of a point off the starboard bow; at thirteen and three-quarters minutes before said collision (being two and one-seventh miles away), dead ahead; at twelve and one-half minutes before said collision (being two miles away), one-third of a point off the port bow, the ship bearing three-tenths of a point off the port bow of the tug, and showing her red light to both the tug and bark, the bark bearing three-tenths of a point off the port bow of the ship; at eleven and one-quarter minutes before said collision (being one and three-fourths miles away), one-half a point off the port bow, the ship bearing one-third of a point off the port bow of the tug, and showing her red

light to both the tug and the bark, and the bark bearing four-tenths of a point off the port bow of the ship; at ten minutes before said collision (being one and four-sevenths miles away), five-eighths of a point off the port bow, the ship bearing four-tenths of a point off the port bow of the tug, and showing her red light to both the tug and the bark, and the bark bearing from the ship five-ninths of a point off her port bow; at eight and three-quarters minutes before said collision (being one and one-third miles away), one-half of a point off the port bow, the ship bearing one-half of a point off the port bow of the tug, showing her red light to both the tug and the bark, and the bark bearing one-half of a point off the port bow of the ship; at seven and one-half minutes before said collision (being one and one-seventh miles away), one-sixth of a point off the port bow, the ship bearing two-thirds of a point off the port bow of the tug, and showing her red light to both the tug and the bark, the bark bearing one-eighth of a point off the port bow of the ship; at six and one-quarter minutes before said collision (being nine-tenths of a mile away), dead ahead, the ship bearing two-thirds of a point off the port bow of the tug, and showing both of her lights to both the tug and the bark, the bark bearing one-tenth of a point off the starboard bow of the ship; at five minutes before the said collision (being five-sevenths of a mile away), dead ahead, the ship bearing three-quarters of a point off the port bow of the tug, and showing both her lights to the tug and her green light to the bark, the bark bearing one-sixth of a point off the starboard bow of the ship; at three and three-quarters minutes before said collision (being one-half of a mile away), dead ahead, the ship bearing five-sixths of a point off the port bow of the tug, and showing both of her lights to the tug and her green light to the bark, the bark bearing one-sixth of a point off the starboard bow of the ship.

"14. That two and one-half minutes before the said collision, said tug being about one-third of a mile distant from said ship and one-half a point off her port bow, the ship bearing about one and three-eighths points off the port bow

of the tug, and showing both her lights to the bark and her red light to the tug, and the bark bearing dead ahead from the ship, said tug, for the purpose of avoiding the ship, put her helm hard-a-port and swung to starboard; but the said ship immediately thereafter, instead of keeping her course or putting her helm to port, either of which she could, and one of which she should have done, and either of which would have avoided said collision, carelessly, unskillfully, and negligently put her helm hard-a-starboard, and kept the same in that position until the said collision occurred.

"15. That the red lights of both said tug and said bark were visible to and were seen by those on board of said ship from ten to twelve minutes before said collision.

"16. That although said lights of both said tug and said bark were properly set and brightly burning, such were the relative positions of said ship, said tug, and said bark, that neither said tug nor said bark, at any time up to the time of the collision, showed the ship any side or colored lights, except said red lights.

"17. That owing to the putting of said helm of said ship to starboard, as aforesaid, said ship slewed rapidly around to port until her course was changed to about north-northeast, and she then, at about two o'clock in the morning of said 11th day of June, while the tug was still swinging to starboard, under a ported helm, collided with said tug, striking her 'bow on' on the port side, just abaft of midships, thereby causing great damage to the hull of said tug, her machinery, tackle, apparel, and furniture.

"18. That had said ship kept her course, or had her helm been put to port at the time it was put to starboard, said collision would have been avoided, and no injury would have been occasioned to either said ship, said tug, or said bark.

"19. That no special circumstance at any time mentioned herein existed which rendered a change of course on the part of said ship necessary or excusable.

"20. That as soon as it was possible for those on board of

said tug to discover that said ship had put her helm to starboard, everything was done on said tug to avoid said collision and lessen the damage occasioned thereby, and at the time of said collision said tug, owing to said port helm, was heading about north-northwest.

"21. That up to the time that said ship's helm was put to starboard as aforesaid, no one on board of said tug had any reason to expect or anticipate any change of course on the part of said ship; and, after the helm of said ship was so put to starboard, nothing that said tug could have done would have averted said collision.

"22. That the mate of said tug was a competent person for that position, and faithfully performed his duties at all times mentioned in these findings, but he had no license.

"23. That said collision was caused and all the damage resulting therefrom was occasioned solely by the negligence, want of skill, and improper conduct of the officers and persons navigating said ship Blue Jacket, and not from any fault, negligence, or improper conduct on the part of any person on board the said steam-tug Tacoma.

"24. That the side-lights of the said ship Blue Jacket were at all times herein mentioned brightly burning, but were not placed or constructed so as to show a uniform and unbroken light over an arc of the horizon of ten points of the compass, or so fixed as to throw a light from right ahead to two points abaft the beam on the side of the ship on which said lights were respectively placed; but these facts in no wise contributed to said collision.

"25. That said steam-tug Tacoma had no such lookout as is required by law; but this fact in no wise contributed to said collision.

"26. That said ship was well officered and manned, and had the usual number of officers and seamen on board.

"27. That said steam-tug was damaged by said collision in the sum of $7,500, and the said libellant has, in consequence of said damage, been obliged to expend, and has expended, in repairing the same, the sum of $7,500, the last of which said sum was so paid on or prior to the 15th day of August,

1885; and that said libellant is entitled to interest at the rate of ten per cent. per annum upon said sum from said 15th day of August, 1885, to this day.

" 28. That said libellant, the Tacoma Mill Company, by reason of said collision, has sustained damages by being deprived of the services and use of said tug for the period of fifty days immediately following said collision; and that said services and use were during said period of fifty days reasonably worth the sum of $47.50 per day over and above all expenses of running and operating the said tug.

" 29. That on the 4th day of September, 1885, J. Furth and Bailey Gatzert entered into a stipulation, in accordance with the rules and practice of the said District Court, in the sum of $24,000, for the release of said ship Blue Jacket from arrest in this cause, which said stipulation was conditioned that said claimant should abide and pay the money awarded in the final decree rendered in this cause by this court in case of appeal to the appellate court.

" 30. That on the 22d day of March, 1887, J. Furth and Bailey Gatzert entered into a stipulation in accordance with the rules and practice of the said District Court, in the sum of $20,000, upon an appeal from the said District Court to this court, which said stipulation was conditioned that the said stipulators should pay all damages and costs that should be adjudged against the said ship on said appeal, and also that said ship should satisfy and perform the decree appealed from in case it should be affirmed, and any judgment or order which this court might render or order to be rendered by the District Court, not exceeding in amount or value the said sum of $20,000."

Additional findings requested by the proctor for the appellants, and adopted by the Supreme Court:

" 1. The master of the tug went to bed a little after midnight preceding the collision, and the acting mate was alone in the pilot-house of the tug, and was the only officer in charge of the navigation of the tug, and the only person in charge of the tug's wheel from midnight until one minute or less before the collision, when the captain arrived on

deck. [But this fact did not contribute to the collision.]"
Bracketed clause added by court.

" 2. The captain was awakened and arrived on deck about one-half a minute before the vessels came together; and, after inquiring what the trouble was, and being told that a ship was coming into them, ordered the mate to stop and reverse, which order was only partly obeyed by the mate, who rang the bells in obedience to the order sufficient to stop the engines, but not to reverse them, and then let go of the bell-pull and of the wheel, and ran out of the pilot-house to avoid danger to himself, which he supposed to be imminent, as the ship was then coming in contact with the tug.

" 3. For some time prior to and until the captain ordered the mate of the tug to stop and reverse, the engines of the tug were going ahead at full speed, and the tug was making the speed hereinbefore found of two miles an hour by the shore."

And from these findings of fact the court makes the following conclusions of law:

" 1. That said tug was not in fault or in any wise blamable for any damage resulting either to herself or said ship.

" 2. The said ship was in fault in this: First, she did not keep a sufficiently steady helm, but allowed herself to swing alternately to port and starboard before she put her helm hard-a-starboard; second, she put her helm hard-a-starboard when she should have put it hard-a-port, or kept her course.

"3. That said libellant, the Tacoma Mill Company, is entitled to recover of and from F. F. Percival, the claimant in this cause, and from J. Furth and Bailey Gatzert, his stipulators, the sum of twelve thousand one hundred and twenty-one dollars and two cents ($12,121.02), and its costs and disbursements to be taxed, and is entitled to an order that execution issue upon said judgment against the goods, chattels, and lands of said claimant and stipulators.

" 4. That said libellant is entitled to a decree dismissing the cross-libel, at the costs of the cross-libellant."

JONES, C. J., and ALLYN, J., concurred.